# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

| | |
|---|---|
| **HERBERT JAMES BRADLEY** | **CIVIL ACTION NO. 3:15-cv-0079** |
| **LA. DOC #104064** | |
| | **SECTION P** |
| **VS.** | |
| | **JUDGE ROBERT G. JAMES** |
| **BURL CAIN, WARDEN, LOUISIANA** | |
| **STATE PENITENTIARY** | **MAGISTRATE JUDGE HAYES** |

## REPORT AND RECOMMENDATION

Pro se Petitioner Herbert J. Bradley, a prisoner in the custody of Louisiana's Department of Corrections, filed the instant Petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on January 13, 2015. [doc. # 1]. Petitioner attacks his second degree murder conviction and the life sentence imposed by the Fourth Judicial District Court, Ouachita Parish. This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of the Court.

## Background

A Ouachita Parish Grand Jury indicted Petitioner on one count of second degree murder. [doc. # 15-1, p. 51]. On May 2, 2011, following trial, twelve jurors found Petitioner guilty as charged. [doc. # 15-5, p. 13-25]. On July 25, 2011, the trial judge sentenced Petitioner to imprisonment for life without benefit of probation, parole, or suspension of sentence. *Id.* at 28.

On January 13, 2012, Petitioner, via counsel, appealed to the Louisiana Second Circuit Court of Appeal and claimed that the jury based its decision on insufficient evidence. [doc. # 1-3, p. 2]. On February 28, 2012, Petitioner filed a pro se brief and claimed that the prosecution failed to inform the jury that it granted witnesses immunity in exchange for their testimony. [doc. # 15-19, p. 44]. The appellate court affirmed Petitioner's conviction and sentence on May

16, 2012.  *State v. Bradley*, 135 So. 3d 647 (La. App. 2 Cir. 2012).  The Louisiana Supreme

Court denied Petitioner's subsequent application for writ of certiorari on November 2, 2012.

*State ex rel. Bradley v. State*, 99 So. 3d 666 (La. 2012).  Petitioner did not seek further direct

review before the United States Supreme Court.

On December 18, 2013, Petitioner filed a pro se application for post-conviction relief

before the Fourth Judicial District Court and claimed that his appellate counsel rendered

ineffective assistance.  [doc. # 15-20, p. 12].  The district court denied relief on January 24,

2014.  [doc. # 1-4, p. 2].  The Second Circuit Court of Appeal denied relief on March 27, 2014.

*Id.* at 22.  The Louisiana Supreme Court, on December 8, 2014, likewise denied relief.  *Id.* at 42.

Petitioner filed the instant Petition on January 13, 2015.  [doc. # 1].  He raises two

assignments of error: ineffective assistance of appellate counsel and insufficient evidence.  *Id.*

The matter is now before the Court.

## Law and Analysis

### I.    Standard of Review – 28 U.S.C. § 2254

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. §

2254, governs *habeas corpus* relief.  The AEDPA limits how a federal court may consider

*habeas* claims.  After the state courts have "adjudicated the merits" of an inmate's complaints,

federal review "is limited to the record that was before the state court[.]"  *Cullen v. Pinholster*,

131 S. Ct. 1388, 1398 (2011).  An inmate must show that the adjudication of the claim in state

court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)). "The 'contrary to' requirement refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id.* at 740. Under the "unreasonable application" clause, a federal *habeas* court may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies the principle to the facts of the prisoner's case." *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts. Federal courts presume such determinations to be correct; however, a petitioner can rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## II.     Petitioner's Claims

A. <u>Claim One: Insufficient Evidence</u>

Petitioner claims that the evidence presented at trial was insufficient to find him guilty of the charged crime. [doc. # 1-2, p. 13]. When a habeas petitioner asserts that the evidence presented was insufficient to support his conviction, the limited question is whether the state appellate court's decision to reject that claim was an objectively unreasonable application of the clearly established federal law set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Williams v.*

3

*Puckett*, 283 F.3d 272, 278-79 (5th Cir. 2002).  A conviction is based on sufficient evidence if,

"after viewing the evidence in the light most favorable to the prosecution, any rational trier of

fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*,

443 U.S. at 319.  The *Jackson* inquiry "does not focus on whether the trier of fact made the

correct guilt or innocence determination, but rather whether it made a rational decision to convict

or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993).  Thus, a conviction may rest on

sufficient evidence "even though the facts also support one or more reasonable hypotheses

consistent with the defendant's claim of innocence." *Gibson v. Collins*, 947 F.2d 780, 783 (5th

Cir. 1991).

Here, invoking *Jackson*, the Second Circuit Court of Appeal began review by referencing

the pertinent definition of second degree murder found in LA. REV. STAT. § 14:30.1: "Second

degree murder is the killing of a human being: (1) When the offender has a specific intent to kill

or to inflict great bodily harm." *Bradley*, 135 So. 3d at 651-52.  The court summarized the

relevant evidence presented at trial as follows:

> Defendant's jury trial took place in April 2011, where the following evidence was
> adduced. Defendant and his wife, Sallie, lived in a house on South 7th Street in
> Monroe, Louisiana. Between them, they had several children (mostly adults) and
> grandchildren. The couple had been having marital problems[1]; and, on the evening
> of December 31, 2009, Sallie drove to her mother's home in Monroe. Sallie brought
> two bags of clothes with her and told her mother, Almeda Caesar, that she was tired
> of her husband "always accusing her of having sex with another man." According
> to her mother, after Sallie unloaded her clothes at her mother's house, she received
> a phone call from Defendant. In response to the phone call, Sallie decided to return

---

[1] The State introduced into evidence a form completed by Ms. Bradley during counseling
where she outlined her disagreements with Defendant.  On this form, entitled "Setting
Boundaries," the victim wrote that she did not want to be awakened "for sex when I have to
work," that "it hurts my feelings for you to think I'm cheating" and that she would prefer not to
"be thought of as a whore."

to the marital home, saying she was "going to go back one more time to try to make it work." Sallie then drove home and called her mother to let her know that she arrived home.

At about 8:30 p.m., two of Defendant's daughters, Zavier Harris and L'Maryyan Bradley, stopped by the Bradleys' house to borrow some money. Zavier testified that she did not see her father and Sallie arguing or fighting, although she was aware that they had been separated on occasion in the past. The daughters left the Bradleys' home and went out to a club.

At the house next door to the Bradleys, Afrika Howard was sitting with an elderly person. Ms. Howard heard what she thought were firecrackers outside and then she heard a knock at the door. When she looked outside, she saw no one there, but she saw a red truck driving away. She believed that this truck (a red GMC Yukon) was the truck she had often seen parked at the Bradleys' house, and it belonged to Defendant.

Before dawn on January 1, 2010, Jerome Manning, a good friend of Defendant, was driving down South 7th Street. Mr. Manning was on his way to work and in the area to check on his elderly mother. As he drove by the Bradleys' house, he saw a person lying partly in the street in front of the home. The person was Sallie Bradley. She was still alive, but was unable to speak. A neighbor called 911 and paramedics and police responded just before 4:30 a.m.[2]

Sallie had suffered five gunshot wounds to her upper body (three of which were in her back), and she died as a result of these wounds before she was able to make a statement. A responding Monroe police officer, Corporal Greg Bauer, found a blood trail leading from where Sallie lay in the grass up to the Bradleys' front door. Officers searched the home, but found no one inside; the doors were all locked except for the front door and the windows were protected by burglar bars. Police found blood spatters on the front door glass and just inside the front doorway. Officers also found spent bullets in several locations and a bullet fragment near the door. There were no signs of forced entry, and a woman's purse containing $500 in cash was still in the house.

At about 4:00 or 4:30 a.m., L'Maryyan received a call on her cell phone from her mother, Deborah Harris. Ms. Harris asked L'Maryyan and Zaveir to come to Ms. Harris' house on Gordon Avenue. The women drove from the club to Ms. Harris' home.

---

[2] Phone records show that Defendant called Mr. Manning at 4:22 a.m. and 4:36 a.m.  Mr. Manning denied that he spoke with Defendant.

When L'Maryyan and Zaveir arrived at Ms. Harris' house, they observed Defendant standing outside the house, but did not see his red GMC Yukon parked in the driveway. Zaveir went inside to check on her two-year-old daughter; and, when she found nothing wrong, she came back outside to speak with her father. Defendant told L'Maryyan, "Your daddy's in trouble," and then asked his daughters to take him to his aunt's, Ora Bradley's, house. Defendant told his daughters that his vehicle was parked in Zaveir's front yard approximately four blocks away, but he would not explain why. During the drive, L'Maryyan drove past Mr. Manning's house and Defendant asked L'Maryyan to look and see if Mr. Manning was at home, but she saw that he was not there. She called Mr. Manning, who told her not to come by her father's house and that "he [Manning] had everything under control."

When they dropped off Defendant at Ora Bradley's house, L'Maryyan and Zaveir went to get their older sister, Sherbert Bradley, to find out why their father was behaving so strangely. The three then returned to Ora Bradley's house.

There, Defendant was making phone calls in an effort to arrange to go to Texas. Zaveir testified that Defendant related that he "needed to lay low for a couple of days." L'Maryyan testified that Defendant said "he needs to get out of town." Sherbert testified that Defendant stated "that he was in trouble and he needed to get out of town." At that time, the daughters did not know that anything had happened to Sallie and none of the daughters had ever seen their father with a firearm.

The daughters agreed that Defendant first called their aunt Pam in Mesquite, Texas, and then he called his son, Jaworski Underwood, in Arlington, Texas. Sherbert's boyfriend, Lucky, eventually agreed to drive Defendant to Texas accompanied by Sherbert, L'Maryyan and Zaveir. During the drive, Defendant did not talk; however, L'Maryyan received a phone call from "Neka" (Shaniqua Caesar), Sallie Bradley's daughter, who told L'Maryyan, "Your dad killed my mama." When L'Maryyan said this out loud in the car, Defendant shook his head indicating "no."

The group, including Defendant, traveled to Kaufman County, Texas, where Jaworski was waiting to pick up his father. Jaworski had agreed to pick up Defendant and take him back to Arlington, but Defendant had not, at that point, explained why he needed to stay in Texas. Jaworski testified that, after they arrived in Arlington, people began to call and inquire about his father, so Jaworski confronted Defendant. Jaworski related that "He [Defendant] said that she [Sallie] died, that he killed her.... He said he shot her.... [A]bout three times ... in the back and shoulder...." Jaworski further testified that he then called the Monroe, Louisiana, and Arlington, Texas, police, and the Arlington police came to Jaworski's residence and arrested Defendant.

When news of the killing spread, Sallie's brother, Dennis Caesar, who was incarcerated at the time, related to police that Defendant owned  a .38 caliber

handgun which he had seen while moving some furniture into the Bradleys' house. Police searched Defendant's SUV, but did not find a firearm inside. The murder weapon was not recovered.

Several days later, after Defendant was returned to Louisiana from Texas, Detective James Willis interviewed Defendant. After the detective introduced himself and informed Defendant that he was investigating the murder of his wife, Defendant began crying and spontaneously told the detective that "he could not remember anything" and that "Sallie was his heart." Defendant did not make any further statements to police.

Defendant elected to testify at trial. He admitted that he had several felony drug convictions. He said that he normally awoke at 4:00 or 4:30 a.m. in order to cook breakfast for his wife before she left for work at 5:30 a.m. Defendant testified, however, that he had been invited out by friends to attend a New Year's Eve party on the night Sallie was killed. Defendant stated that he went out to a club called "Eddie Gibbs" at about 1:00 a.m. on January 1, 2010. He testified that he stayed at the club playing pool until about 3:00 or 3:30 a.m. and then drove home. Defendant related that there was no unfamiliar car in the driveway when he arrived home and he entered his home through the gameroom door. According to Defendant, when he entered the house, he saw  his wife "with  two dudes holding her." Defendant testified that one of the men said, "We've been waiting on you so you might as well come on in." Defendant explained:

> I just stopped. And then by that time, when I stopped, one dude had a gun, and so I started trying to ease back. And so they was steady easing forward with her. So I started trying to ease back. So by that time, when I eased back, I just—I had my cell—I got my cell phone, like I had something. And so by that time, I faked it. Then, I took out running. And then I went out the back door.

Defendant said that he then heard about three shots just as he ran into the backyard. Next, he went to his truck and drove toward his daughter's house; he said that he did not see his wife again.

Defendant testified that he believed the incident was related to associates of his son, Jaworski. Defendant explained that Jaworski and his friends did "little things," that he described as a pigeon drop scheme, in the Ruston area rather than their home town. Defendant said that Jaworski claimed that he would "fix up little packages of cocaine, but it don't be fully cocaine, you know. It would be like—it would be like the quantity of it would be real, real weak." He further explained that "the only house that the people that they had been dealing with know was my house." Defendant stated that, in December 2009, two men had come to his house three times demanding money as a result of one of these schemes.

7

Defendant testified that, after the shooting, he wanted to contact Jaworski because he attributed the events of that evening to Jaworski's scheme and he wanted Jaworski to pay the men. Defendant further testified that, at that time, he did not know that his wife had actually been shot; he thought the shots were simply to scare him. He explained that, when he finally told Jaworski what happened, his son "started freaking out" and asking whether anyone had followed him. Defendant stated that he intended for Jaworski to bring him back to Monroe the next day so Jaworski could pay the men he had cheated; but, instead, Jaworski had Defendant arrested. Defendant denied ever having a gun (he was a convicted felon) and denied that he ever wanted to kill his wife. He also denied the various accusations that she had written on the counseling form and he denied that he called Mr. Manning on the morning of the shooting. Defendant admitted that, while at Ora Bradley's house, he called Pam in Mesquite before he called Jaworski, but he testified that he could not recall why he had called Pam.

Trakeka Charleston, a dancer, testified that she had known Jaworski Underwood for about four or five years. She stated that, when Jaworski was in Monroe, he frequented the club where she danced. Ms. Charleston testified that Jaworski was in town the third week in December 2009 because she saw him at the club.

Jaworski denied that he had been in Monroe in December 2009 and said that he had not been there for six or seven months. Although he had a 2009 conviction in Texas for possession of marijuana and admitted that he had "associates—people who I know that deal with it," Jaworski denied any more serious drug convictions or dealing drugs. Jaworski testified that, in October 2009, he introduced his father to his associates because his father wanted to buy a pound of marijuana.

The last witness to testify was John Wilson, Zaveir's husband. Mr. Wilson testified that, in January 2010, after the shooting, Mr. Manning brought $500 to Zaveir to "give it to her daddy," and that Mr. Manning told Zaveir:

> That the police doesn't [ sic ] have any evidence, that he took care of the gun situation, don't worry about anything, and he going to take care of everything.

Mr. Manning denied that he made any such statement about a gun.

*Id.* at 648-651 (footnotes in original).

Applying *Jackson*, the Second Circuit held that the evidence presented was "sufficient to prove beyond a reasonable doubt that Defendant committed the second degree murder of his wife." *Id.* at 651. The court reasoned:

> The jury plainly chose to credit the testimony of the State's witnesses, in particular the testimony of Jaworski Underwood. A review of the above-described testimony reveals that to be a rational choice. Defendant fled from the scene immediately after the shooting and, rather than summon the police, he called his friend, his relatives and his children in a hasty effort to "get out of town," where he finally admitted to his son that he killed Sallie.

*Id.* at 652.

A review of the trial record shows that the appellate court's application of *Jackson* was objectively reasonable.  This claim is without merit and should be **DENIED**.

B.  Claim Two: Ineffective Assistance of Appellate Counsel

Petitioner claims that his appellate counsel rendered ineffective assistance by failing to argue that the trial court erroneously allowed the prosecution to present gruesome photographs to the jury.  [doc. # 1-2, p. 16].  To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his counsel's actions fell below an objective standard of reasonableness and that the ineffectiveness of counsel prejudiced him.[3]  *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984).  If the petitioner does not make a sufficient showing as to one prong of the test, the other prong need not be considered.  *Tucker v. Johnson*, 115 F.3d 276, 281 (5th Cir. 1997).  The prongs of the test need not be analyzed in any particular order. *Goodwin v. Johnson*, 132 F.3d 162, 172 n.6 (5th Cir. 1997).  Further, "mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue."  *Green v. Johnson*, 160 F.3d 1029, 1042-43 (5th Cir. 1998).

When applying the first prong of *Strickland*, federal courts do not second-guess the attorney's decision from the distorting perspective of hindsight; rather, they presume that the

---

[3] To prove that an appellate counsel was ineffective, a petitioner must satisfy the two-prong test enunciated in *Strickland*. *See Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir. 2004).

attorney's actions are encompassed within the wide range of reasonable competence and fall under the ambit of trial strategy. *See Strickland*, 466 U.S. at 689-90. The burden, therefore, is on the petitioner to show that counsel's representation fell "outside the wide range of professionally competent assistance." *Id.* at 690; *Ward v. Whitley*, 21 F.3d 1355 (5th Cir. 1994). In other words, the petitioner must demonstrate that counsel's representation was objectively unreasonable. *Strickland*, 466 U.S. at 688.

To establish prejudice in the context of a claim that counsel was ineffective on appeal, a petitioner must show a reasonable probability that he would have succeeded on appeal but for his counsel's deficient representation. *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001). A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "That requires a substantial, not just conceivable, likelihood of a different result." *Cullen*, 131 S. Ct. at 1403 (internal quotation marks and citation omitted).

Finally, when review is governed by the AEDPA, review of the state court's resolution of the ineffective assistance of counsel claim is "doubly deferential," *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009), since the question is "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). Importantly, "[t]his is different from asking whether defense counsel's performance fell below *Strickland's* standard," because the "state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* Consequently, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 786. To obtain relief, a petitioner must show that the state court's ruling on the claim was "so lacking in justification that there was an error well understood and

10

comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.  "The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* at 788.

At Petitioner's trial, the prosecution introduced a photograph depicting the victim's body in the forensic pathologist's office.  [doc. # 15-13, p. 10-11].  Following testimony from the forensic pathologist, the prosecutor called the victim's mother to testify and asked her whether the individual in the photograph was her daughter.  [doc. # 15-14, p. 47-48].  Petitioner's counsel objected and moved for a mistrial after the victim's mother became emotional.  *Id.* at 48-49.  Defense counsel argued that the prosecution was improperly attempting to elicit sympathy from the jury.  *Id.* at 48.  The prosecutor responded that he only presented the photograph to prove the victim's identity.  *Id.* at 49.  The trial judge denied counsel's objection and motion for mistrial, reasoning that "the identity of the victim is an integral part of the charge." *Id.* at 52-54.  When the jury returned to the courtroom, the judge instructed the jurors that they were "not allowed to make any decisions . . . based on sympathy or passion." *Id.* at 59.

An appellate counsel is not required to raise all non-frivolous issues on appeal, even if the defendant requests that the issues be raised. *Jones v. Barnes*, 463 U.S. 745, 750-54 (1983) ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of rigorous and effective advocacy . . . .").  Similarly, counsel does not perform deficiently by failing to pursue an argument that has no validity or hope of success.  *U.S. v. Gaudet*, 81 F.3d 585, 591 (5th Cir. 1996).  When appellate counsel competently asserts some claims on a defendant's behalf, it is difficult to sustain an ineffective assistance claim based on allegations

11

that counsel was deficient for failing to assert other claims.  *Smith v. Robbins*, 528 U.S. 259, 288 (2000).

Here, as in *Robbins*, because appellate counsel competently raised an issue on Petitioner's behalf (i.e. insufficient evidence) it is difficult to find that counsel's performance was deficient.  *See Gibson*, 978 So. 2d at 1219.  More importantly, there is no reasonable probability that appellate counsel would have succeeded had he raised Petitioner's proposed claim on appeal.

First, to the extent Petitioner claims that the trial court improperly admitted the photograph in question, the Court highlights that Petitioner's trial counsel did not object when the State moved to introduce it.  Thus, had appellate counsel raised this issue, the appellate court would have rejected it based on counsel's failure to object.  *See* LA. CODE. CRIM. PROC. art. 841 ("An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.").

Even if counsel did object, there is no reasonable probability that the appellate court would have overturned the trial court's evidentiary ruling.  In Louisiana, "Photographs of the victim at the murder scene are generally admissible to prove corpus delicti, corroborate other evidence and to establish cause of death, identity, or the number, location and severity of wounds."  *State v. Davis*, 637 So. 2d 1012, 1026 (La. 1994).  "It is well established that the test of admissibility of allegedly gruesome photographs is whether their probative value outweighs the possible prejudice that may result from their display to the jury."  *State v. George*, 346 So. 2d

694, 702-03 (La. 1977).[4]  Specifically, "Photographic evidence will be admitted unless it is so gruesome that it overwhelms jurors' reason and leads them to convict without sufficient other evidence." *State v. Magee*, 103 So. 3d 285, 323 (La. 2012).

Here, Petitioner does not argue that the photograph was so gruesome that it overwhelmed the jurors' reason; in fact, Petitioner concedes—and the Court agrees—that the state court record "does not disclose how the gruesome pictures of the victim had an effect on the jury . . . ." [doc. # 1-2, p. 21].  Moreover, it is manifest that the prosecution introduced the photograph to prove the identity of the victim.[5]

Admissibility aside, Petitioner appears to ground his claim in the manner in which the prosecutor chose to identify the victim.  Specifically, Petitioner argues that the prosecutor intentionally presented the photograph to the victim's mother to either inflame, or elicit sympathy from, the jury.  [doc. # 1-2, p. 21].  As mentioned above, Petitioner's trial counsel moved for a mistrial on this basis.  [doc. # 15-14, p. 48].  That said, counsel did not, and Petitioner does not now, identify a particular rule of law that the trial court violated when it denied counsel's motion.

Presumably, Petitioner contends that the court violated LA. CODE CRIM. PROC. art. 775, which states, in pertinent part, "Upon motion of a defendant, a mistrial shall be ordered, and in a

---

[4] To be precise, LA. CODE EVID. art. 403 states that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."

[5] *See State v. Broaden*, 780 So. 2d 349, 364 (La. 2001) (finding that the admission of gruesome photographs was not reversible error and reasoning, in part, that the "state is entitled to the moral force of its evidence . . . ."); *State v. Lindsey*, 404 So. 2d 466, 476 (La. 1981) (holding that the trial court did not err when it admitted photographs depicting the nude body of the victim lying on her back on an autopsy table).

jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it

impossible for the defendant to obtain a fair trial . . . ."   A mistrial is a "drastic remedy" in

Louisiana.  *State v. Mark*, 146 So. 3d 886, 903 (La. App. 4 Cir. 2014) (citations omitted).

Determining "'whether a mistrial is warranted[] lies within the sound discretion of the trial

judge, and this decision will not be overturned on appeal absent an abuse of that discretion.'"  *Id.*

(quoting *State v. Wessinger*, 736 So. 2d 162, 183 (La. 1999)).

     Here, while it is likely that the prosecutor could have proved the victim's identity with a

witness less prone to emotional distress, the Court does not find that the prosecutor's decision

made it impossible for Petitioner to obtain a fair trial.  Notably, and to reiterate, when the jury

returned to the courtroom following the incident,  the trial judge instructed the jury not to "make

any decisions based on sympathy or passion."  [doc. # 15-14, p. 59].  In addition, the judge's

charge to the jury included the following instruction, "You are not to be influenced by sympathy,

passion, prejudice, or public opinion."  [doc. # 15-5, p. 8].  These cautionary instructions likely

lessened any prejudicial effect that the prosecutor's actions had on Petitioner's ability to obtain a

fair trial.

     It appears that the trial judge was well within his discretion in denying Petitioner's

motion.[6]   For this reason, the Court finds it unlikely that the appellate court, if presented with

---

     [6] *C.f. State v. Domangue*, 350 So. 2d 599, 602 (La. 1977) (affirming denial of mistrial
where rape victim's spouse cried during closing arguments); *State v. Licona*, 141 So. 3d 333,
339 (La. App. 5 Cir. 2014) (affirming denial of mistrial where prosecutor cried during his
opening statement and reasoning that courts "'must credit the jurors with the good sense and
fair-mindedness to see these outbursts for what they [are], the natural and irrelevant expression
of human emotion, and not let the outbursts influence their decision.'") (citing *State v. Clark*,
851 So. 2d 1055, n.25 (La. 2003); *Mark*, 146 So. 3d at 903 (affirming denial of mistrial after
victim burst into tears while testifying, underlining that the judge instructed the jury not to be
influenced by sympathy or passion, and observing that Louisiana courts "traditionally upheld
denials of motions for mistrial based on emotional outbursts when a defendant fails to show"

Petitioner's proposed claim, would have reversed the trial judge's decision.  By extension, the Court cannot fault appellate counsel for making the tactical decision not to raise the claim on appeal.  *See Jones*, 463 U.S. at 746 (applauding advocates for "winnowing out weaker arguments on appeal and focusing on one central issue if possible . . . .").  This claim should be **DENIED**.

<u>Conclusion</u>

For the reasons stated above, **IT IS RECOMMENDED** that the Petition for writ of habeas corpus filed by Petitioner Herbert J. Bradley, [doc. # 1], be **DENIED and DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this Recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the District Judge at the time of filing.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE**

---

prejudice); *State v. Chairs*, 106 So. 3d 1232, 1249 (La. App. 5 Cir. 2012) (affirming denial of a mistrial after several emotional outbursts and noting that the trial court instructed the jury not to be influenced by sympathy or passion); *Wessinger*, 736 So. 2d at 183 (affirming denial of mistrial where victim's mother burst into tears and victim's father shouted an expletive); *State v. Hopkins*, 626 So. 2d 820 (La. App. 2 Cir. 1993) (affirming denial of mistrial where victim's family cried during closing arguments and trial court instructed jury not to be influenced by sympathy).

**SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals.  **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.**  *See* 28 U.S.C. § 2253(c)(2).  **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

In Chambers, Monroe, Louisiana, this 6th day of August, 2015.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE